[Civ. No. 11576.    Third Dist.    Sept. 25, 1968.]

MOSES GLUCKMAN, Plaintiff and Appellant, v. MORTON GAINES, Defendant and Respondent.

Martin S. Stolzoff and Morton C. Devor for Plaintiff and Appellant.

Seymour Berger for Defendant and Respondent.

PIERCE, P. J.—Plaintiff brought an action against defendant for support and maintenance under Civil Code section 206. That section provides that it is the duty of "the children of any poor person who is unable to maintain himself by work, to maintain such person to the extent of their ability." The court without a jury determined that plaintiff is the father of defendant, that plaintiff is a poor person, that he is old and infirm; finally it determined that defendant was financially unable to contribute to plaintiff's support. Plaintiff challenges the latter finding. It is the only issue argued on appeal. We hold that substantial evidence supports the trial court's finding. As we view the appeal, however, a combination of factors should be considered to reach the ultimate conclusion. To explain why that is so our discussion will start with an outline of the principles and rules of law governing a case such as this.

At common law there was no legal obligation upon a child to support a needy parent; the duty depends entirely upon statute. (*Duffy* v. *Yordi* (1906) 149 Cal. 140 [84 P. 838,

117 Am.St.Rep. 125, 9 Ann.Cas. 1017, 4 L.R.A. N.S. 1159];
*Parshall* v. *Parshall* (1922) 56 Cal.App. 553 [205 P. 1083].)
█ California by statute gives to the needy parent a right
of support. (Civ. Code, § 206; Civ. Code, §§ 242, 245, 248.)
Plaintiff here purported to sue under Civil Code section 206.
It has been stated that the "main purpose of the statutes
seems to be to protect the public from the burden of support-
ing people who have children able to support them." (*Duffy*
v. *Yordi, supra,* 149 Cal. at p. 142; *Britton* v. *Steinberg*
(1962) 208 Cal.2d 358, 360 [24 Cal.Rptr. 831].) █ The
limit of liability imposed upon the children by section 206 is
to maintain the needy parent "to the extent of their ability."
That, indeed, would be the extent of liability which substan-
tive due process would constitutionally permit. (See *San Ber-
nardino County* v. *McCall* (1942) 56 Cal.App.2d 99 [132 P.2d
65].) A sister state has held that constitutionally the limit of
permissible imposition of liability is reached at a point
beyond which an exaction of support would deprive the child
of the means "to provide for his own resonable necessities."
(*Mallatt* v. *Luihn* (1956) 206 Ore. 678 [294 P.2d 871, 878].)
That case also states that the term "financial circumstances"
as applied to a child means something more than "net
monthly income" or "gross annual income." (*Idem.* at p.
877.) A child's ability to provide support for a parent must
be considered in the light of his other commitments. For
example, it has been held in California that a person's obliga-
tion to support his minor children comes ahead of the obliga-
tion to support a poor parent. (*People* v. *Curry* (1924) 69
Cal.App. 501 [231 P. 358].)
█ It is to be noted that the obligation imposed by section
206 is upon the children collectively. Although the California
Supreme Court in an early case held that where a parent was
being supported by certain of her children and there was no
threat of a withdrawal of that support, the parent was not
entitled to maintain an action against another child for con-
tribution (*Duffy* v. *Yordi, supra,* 149 Cal. 140), section 206
has more recently been construed to require several children
to support the parent in proportion to their abilities to do so
respectively. (*Britton* v. *Steinberg, supra,* 208 Cal.App.2d
358.) Other jurisdictions have stated the same rule. (See
*Hansis* v. *Brougham* (1960) 10 Wis.2d 629 [103 N.W.2d 679];
*Mallatt* v. *Luihn, supra,* 294 P.2d at p. 882; *Lister* v. *Sheridan*
(1962) 33 Misc.2d 650 [226 N.Y.S.2d 232, 234].) Obviously,
abilities cannot be measured or an equitable judgment made
without a comparison of the net resources respectively of each

child to be charged. It is equally obvious that the extent of the liability of the children (individually or collectively) cannot be fixed equitably without weighing the extent of ability against the extent of the parent's needs. A further factor must be taken into consideration. To what extent does the parent have a call morally upon his child—by past treatment and not just by consanguinity? Where an actual abandonment of the child by the parent has occurred, the Legislature by the enactment of Civil Code section 206.5 in 1955 (Stats. 1955, ch. 613, p. 1102) has provided means by which a child can cause all filial support liability to be wiped out. In cases both before and after the enactment of that section the factor of abandonment has been considered. (*Duffy* v. *Yordi, supra,* 149 Cal., p. 141; *Britton* v. *Steinberg, supra,* 208 Cal. App.2d p. 359.) Ill treatment, not amounting to abandonment, while not an absolute defense to a section 206 action may be such ''as to warrant only minimum consideration from a child or anyone else. . . . A child, neglected or abused during minority, may by marriage or otherwise, attain a status of power and wealth. Love, respect, loyalty, devotion and the natural and inevitable desire of a child to recompense a parent for the love, service, support and sacrifice usually lavished by a parent upon a child, cannot be legislated nor should the law force a child to make recompense for an assumed standard of upbringing, when a trial court finds on credible evidence that it never existed.'' (*Radich* v. *Kruly* (1964) 226 Cal.App.2d 683, 687 [38 Cal.Rptr. 340].)

This summary of the law has served its purpose if it has pointed out the many factors which a trial court must consider and weigh in determining whether, or to what extent, a child owes an obligation to support a parent. ■ In making that determination the trial court possesses a wide discretion. (*Woolams* v. *Woolams* (1952) 115 Cal.App.2d 1 [251 P.2d 392].) The burden of proof, of course, is upon plaintiff. That burden includes an obligation of presenting to the trial court a clear picture of all factors necessary to a fair determination. In the case before us plaintiff contented himself with a very incomplete showing of his needs and an equally unsatisfactory showing of defendant's ability to meet those needs. We shall consider first what the record establishes as regards defendant's financial worth and commitments.

The financial position of defendant is paradoxical. He has a potential possible future net worth of over a hundred thousand dollars and presently not enough money to live on. This

is simply explained. His principal asset is 600 acres of unimproved land. It is non-income producing. He owns secured promissory notes totaling $30,000. From these he derives a total monthly income of $826. (His total income from all sources is $882.) BUT against his equity in the 600 acres is a $56,000 trust deed. It bears 10 percent interest. Defendant's outlay to carry merely the *interest* on that at 10 percent is $466.66 per month. When that payment is subtracted from $882, $415.34 is left. Should defendant fail to meet the $466.66 obligation, loss of his equity in his principal asset is most probable.

Payments on the notes defendant owns from which he derives the principal portion of his $826 monthly income are on account of both principal and interest. It has been computed that in three years the $30,000 asset will have been dissipated. One cannot say it is not being reinvested. The ''reinvestment,'' however, is in the immediate preservation of the equity in the 600 acres.

Some day that acreage may have subdivision possibilities— if defendant can hold it long enough. Presently, the land is inaccessible. (Its only access bridge has been washed out.)

Our description of defendant's financial predicament is illustrative; not exhaustive. He has other monthly income of less than a hundred dollars. He has other assets, consisting principally of fractional interests in land equities, the values of which are uncertain. They produce no income.

He drives a 1962 automobile and has about $700 in a checking account.

There are no uncertainties regarding his liabilities. In addition to the $466.66 outlay for interest he pays out $50 per month on another secured loan. (He owes $19,200 on other loans on which he is apparently not making any payments and not able to make any.) He is married. He supports two minor children by a previous marriage at a cost of approximately $130 per month, including outlays for their medical and dental bills. His own medical bills are $50 per month. His wife owns the home they live in. His contribution to mortgage payments is $56.18 per month. There are normal living expenses and costs of automobile upkeep. The record shows that ends currently would not meet without help from his wife. From active work defendant earns between $50-$75 per month. He suffers from hepatitis, hypertension and has had to be hospitalized frequently.

Assuming he could find a purchaser, should he be required

to dispose of the 600 acres? Plaintiff's real estate expert placed a value on this land of $125,000. Defendant refused to evaluate his equity. He said: "[M]ake me an offer." Obviously, Mr. and Mrs. Gaines—expending over half of their rapidly dwindling income to carry this property—are gambling on its potential for their future security.

The needs and rights *of plaintiff* can be understood only by stating that which an inadequate record shows of the family background.

Defendant's testimony is all there is of substance in the record to show this background.[1] He does not know who his father is, where he was born or when. His first memories are of living with his mother and brother (or half-brother?) Harry in Palestine. His mother's given name was Golde. Her maiden name was Kupferman. Harry was four or five years older than defendant.[2] Defendant does not know his exact age. He thinks he was born in 1910, and his mother told him he was born in 1910 in Palestine but that he was to say he was born in Austria in 1912 at a nonexistent place called "Sanburg" (Salzburg?) "so that we could beat the quota." There was no father around in Palestine. Defendant never saw plaintiff until defendant was 12 years old. The occasion was this: Defendant and Harry had gone to London with their mother in 1922. There he and Harry had been left with some people. His mother went to the United States. Then— and this seems to have been the first appearance of Moses Gluckman into defendant's life—plaintiff had arrived in London, called for defendant and Harry at the place where they had been living and brought them to this country where they joined defendant's mother. The family moved to Los Angeles.

Defendant's education stopped at the 9th grade. He lived

---

[1]Plaintiff did not attend the trial. His deposition was read into evidence. Defendant's attorney did not attend the taking of that deposition nor was he represented. The deposition was read at the trial. Testimony on the issue of paternity, in fact, as regards the whole family background, was limited to three questions:

"Q. Who is Morton Gaines in relation to you? A. My son."

"Q. Was your son Morton Gaines born in Austria; is that correct? A. Yes. Q. Your son Morton Gaines and your son A. Harry Gluckman were brothers; is that correct? A. Yes."

[2]Harry's death certificate is in evidence. It gives his date of birth as January 1906. There is a picture of defendant and Harry taken together when the two were boys. Harry is at least four years older than defendant. (Harry's grandson, Stephen, a witness for plaintiff at the trial, testified that defendant was the oldest of the Gluckman children. He was obviously mistaken.)

with the family until then. Harry, the older of the two boys, worked in a shoe store. Later he bought one. At the time of his death he had established a chain of nine shoe stores. He organized a corporation which presently owns this chain.

After leaving school defendant also went to work for a shoe store in Vallejo. His contacts with his family and with Harry afterwards were few. At some time in the 1930's, though never changing it by court proceedings, he assumed the name of Gaines.

Plaintiff's grandson, Stephen Gluckman, testified that on the several occasions when he had had contacts with defendant (the latest of which was 21 years ago) the latter was referred to as his uncle and that defendant referred to plaintiff as his father and to Harry as his brother. On the other hand, defendant testified that Harry had told him that they were half-brothers, or as Harry expressed it, "step-brothers." He also recited an incident that when his mother had suggested that defendant be bar mitzvahed plaintiff had refused, stating that he was not his son. (Harry and plaintiff's other sons had been bar mitzvahed.) Defendant said he was told often by plaintiff that he was not his father.[3] When defendant sought information about his birth, he was told: "Don't ask questions."

Now, about Moses Gluckman. Plaintiff is 86 years old and is infirm. He lives in a Jewish home for the aged in Los Angeles. The cost there for room and board is $250 per month. He is under the care of three doctors. His other living expenses in addition to his room and board are $150. He stated as his only asset the sum of $75 per month received from the federal government, apparently as a pension on account of the death of another son, Victor, who was killed in World War II. It was plaintiff's theory that all of his other expenses were being defrayed by his daughter-in-law, Frances Gluckman, widow of Harry.

That was not quite an accurate statement. There was and is another asset. The existence of that asset was not mentioned until it was brought out during the trial on the cross-examination of Stephen Gluckman. Plaintiff is the beneficiary of a testamentary trust under the will of Harry Gluckman who died in 1965.[4]

---

[3] The record shows: "Q. Did Moses Gluckman recognize you at all as a son? A. He told me too often that I wasn't, and how grateful I should be to him for bringing me over from the Old Country. Without him, I would still be there. Q. Did that have any effect upon you as a child? A. Yes, it certainly did."

[4] Plaintiff did not mention this asset in his deposition. He was not asked

Harry's will was put in evidence *by defendant*. Under its terms the entire residue of Harry's estate goes into the testamentary trust mentioned. Plaintiff, who had the burden of proof, produced no evidence whatever of the value of this residue. One asset of the residue, however, was learned. Harry was the owner—apparently the sole owner—of a corporation. It owns a chain of nine shoe stores in the Los Angeles area. Stephen, who manages the stores, admitted the corporation does a gross business of between $700,000 and $800,000. Under the terms of the trust plaintiff is to receive a minimum of $125 per month. The sum is payable from "the capital of this Trust." The same paragraph provides: "If there should not be sufficient capital in the trust to pay such amount, I specifically request that either my wife FRANCES GLUCKMAN or my son STEPHEN J. B. GLUCKMAN pay said amount to my father so long as he shall live." There is another provision applicable to all beneficiaries of the trust. The trustee is invited to invade corpus "to provide for the reasonable *support, care, education*, and *comfort* of such beneficiary. . . ." (Italics ours.) There was vague testimony given by Stephen that the corporation was not *paying* dividends. That testimony meant little or nothing. The court did not learn anything about the salaries of its officers or whether the corporation had *earned* dividends. No financial statement of the corporation was produced. No inventory had been filed by the estate and none was offered at the trial from which the court could find out what the other assets of the trust estate were.

Such is the state of the record.

The trial court found that plaintiff was the father of defendant. On the face of the record evidence of paternity by blood, as we have seen, was scanty. Evidence that plaintiff was poor and dependent upon his children for support was even less convincing. The trial court was of the opinion that plaintiff had sustained his burden of proof on those two issues. If we were called upon to decide that substantial evidence did in fact support those findings by the trial court, we would have difficulty. We need not face that problem. There *is* substantial evidence when we consider all of the factors which must be weighed to sustain the finding of the trial court that

about it. His testimony was to the contrary that he had no assets whatever excepting the $75 monthly payment from the federal government. Is it possible that plaintiff does not know about the testamentary trust? His attorneys in this action are the same attorneys who are probating the estate.

defendant did not have the financial ability to support plaintiff. We list: (1) The paucity of defendant's liquid assets and the absence of a fixed income sufficient to support even his immediate family. (2) There was the fact that plaintiff was presently receiving adequate care and support with no showing that those furnishing it were not both able and obligated to do so. (There was no reasonably acceptable evidence that the income from the chain of nine shoe stores would not take care of Frances Gluckman, Stephen Gluckman *and* plaintiff.) On the record before this court we would say that the percentages of likelihood are greater that defendant if compelled to support plaintiff would become a charge upon the state than that plaintiff will ever become such a charge. (3) Finally, there was evidence of defendant, uncontroverted by the man best able to dispute it (the plaintiff), that Moses Gluckman had very little reason to expect filial devotion from Morton Gaines. The trial court was less skeptical than this court is about the credibility of the proof of parenthood. In any event, if plaintiff is in fact defendant's father, the relationship is limited to one of consanguinity. The record is devoid of evidence that there are any closer ties.

The judgment is affirmed.

Friedman, J., concurred.

Regan, J.—I concur in the result.