[Sac. No. 7948. In Bank. Dec. 12, 1973.]

*DAVID B. SWOAP, as Director, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
BIEUKY DYKSTRA et al., Real Parties in Interest.

*This case was previously entitled "Carleson v. Superior Court."

492

---

**COUNSEL**

Evelle J. Younger, Attorney General, and John Fourt, Deputy Attorney General, for Petitioner.

No appearance for Respondent.

Peter D. Coppelman, Fred J. Hiestand, John F. Moulds III and Blackmon, Isenberg, Moulds & Blicker for Real Parties in Interest.

Jan T. Chilton as Amicus Curiae on behalf of Real Parties in Interest.

## OPINION

SULLIVAN, J.—We are again called upon to determine whether an adult child of a recipient of aid to the aged under the Old Age Security Law (Welf. & Inst. Code, div. 9, pt, 3, ch. 3, § 12000 et seq.)[1] may constitutionally be required to reimburse the state. We addressed ourselves to this question in *County of San Mateo* v. *Boss* (1971) 3 Cal.3d 962 [92 Cal. Rptr. 294, 479 P.2d 654]. We there held that under the particular facts of that case, the adult son of that recipient could not constitutionally be compelled to make reimbursement according to the relatives' responsibility statutes. (§§ 12100, 12101.) As we explain in detail *infra,* we left open the question whether section 206 of the Civil Code provided a rational basis for upholding relatives' responsibility against the challenge that such statutes examined in the light of certain decisions of this court arbitrarily charged welfare costs to one class in society and thereby denied equal protection of the laws. We now undertake to answer that question.

Two recipients of aid to the aged, Ila Huntley and Bieuky Dykstra, and their adult children, Howard Huntley and Julius Dykstra, brought a class action seeking to enjoin state officials from requiring adult children to reimburse the state, pursuant to sections 12100 and 12101, for aid to the aged extended to their parents.

Plaintiff Howard Huntley is the 60-year-old son of 88-year-old widow Ila Huntley, who is the recipient of aid to the aged. Huntley alleges in the complaint that he and his 67-year-old wife had a net monthly income of $656.25; that they are trying to save money for their imminent retirement; that the San Joaquin County Welfare Department ordered him, effective October 1, 1971, to pay the department $70 per month for the support of his mother; and that he could not provide for his own family and at the same time pay such a large sum.

Plaintiff Julius Dykstra is the son of 78-year-old widow, Bieuky Dykstra, who is the recipient of aid to the aged. Dykstra alleges that the same

---

[1]Hereafter, unless otherwise indicated, all section references are to the Welfare and Institutions Code.

welfare department demanded that he pay $75 per month for the support of his mother; that he works as a truck driver and does not have $75 per month left after paying his own family bills, including $180 a month for child support and $145 a month for rent.

On October 14, 1971 the Superior Court of Sacramento County issued a statewide temporary restraining order, enjoining defendants from "[e]nforcing against plaintiffs Julius Dykstra and Howard Huntley, and the class of persons similarly situated, and plaintiffs Bieuky Dykstra and Ila Huntley, and the class of persons similarly situated, the provisions of W & I Code, §§ 12100 and 12101, as amended, and Civil Code, § 206, as amended." Defendants seek a writ of prohibition to prevent the Sacramento Superior Court from enforcing its restraining order on the ground that, since sections 12100[2] and 12101,[3] and Civil Code

---

[2]Section 12100 provides: "If an adult child living within this state fails to contribute to the support of his parent as required by Section 12101, the county granting aid under this chapter may proceed against such child. Upon request to do so, the district attorney or other civil legal officer of the county may maintain an action in the superior court of the county granting such aid, to recover that portion of the aid granted as it is determined that the child is liable to pay, and to secure an order requiring payment of any sums which may become due in the future.

"The granting of or continued receipt of aid shall not be held to be contingent upon any court action or order or the child's compliance with provisions of Section 12101.

"Any adult child held to be liable to make a contribution for the full or partial support of his parent pursuant to the provisions of Section 12101 of this code may appeal to the department for modification of the required contributions. Such appeal shall be handled in the same manner as specified in Chapter 7 (commencing with Section 10950) of Part 2 of this division for appeals filed by an applicant or recipient.

"In the event the amount of earnings, as reported by the relative, is disputed, and it is found necessary to contact the relative's employer, the county shall give prior notice of its intention to do so to the relative."

[3]Section 12101, as amended, provides in relevant part: "The ability of an adult child to contribute to the support of a parent shall be determined in accordance with this section.

"The director may establish a relatives' contribution scale setting forth the amount an adult child shall be required to contribute toward the support of a parent in receipt of aid under this chapter provided that the schedule established shall not exceed the amounts in the schedule specified in this section. Regulations of the department shall prescribe the criteria, methods of investigation and test check procedures relating to the determination of the maximum amount any adult child may be held liable to contribute toward the support of a parent to the end that the required contribution does not impose an undue hardship upon the adult child and administrative time and effort are not expended on non-productive investigative activities.

"For purposes of this chapter, income of an adult child is defined as the sum of the income constituting the separate property of the adult child, the income (excluding earnings) which is community property subject to the direction and control of the adult child, and the earnings of the adult child but not of his or her spouse.

"In computing net income, a flat 25-percent allowance shall be permitted for the cost of personal income taxes, disability insurance taxes and social security taxes, expenses necessary to produce the income, including the cost of transportation to and

section 206[4] are valid, the court had no jurisdiction to enjoin defendants from administering these statutes. (Code Civ. Proc., § 526.)

Under the Old Age Security Law public assistance is extended to aged needy persons. Pursuant to section 12101 the adult children of such recipients are required to contribute to the recipient's support according to a fixed schedule. As a result of the enactment of the Welfare Reform Act of 1971 (Stats. 1971, ch. 578, § 33), the relatives' contribution scale was revised sharply upwards.[5] Section 12100 provides that the county granting aid to the aged may proceed against an adult child of a recipient to collect the amount due under section 12101.

In *County of San Mateo* v. *Boss, supra,* 3 Cal.3d 962, we were of the opinion that the constitutionality of the relatives' responsibility statutes (§§ 12100, 12101) should be determined in the light of the principles announced by us in *Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353].[6] In *Kirchner* we held that liability could not be imposed (pursuant to former § 6650,

---

from work, meals eaten at work, and union dues, and the cost of tools, equipment and uniforms.

"A responsible relative who is self-employed shall also be allowed to deduct the expenses necessary for obtaining the income.

"The department, in establishing criteria and regulations for the administration of this section, shall provide for consideration of contributions made in kind.

". . . . . . . . . . . . . .

"Notwithstanding any other provision of this code to the contrary, the provisions of this section and the regulations of the department adopted pursuant thereto shall be the basis for determining the extent of liability of an adult child to contribute to the support of, or defray the cost of any medical care or hospital care and other services rendered to a recipient pursuant to any provision of this code if he is a recipient of aid under this chapter at the time such medical care or hospital care or other services are rendered."

[4]In 1971, the Legislature enacted section 3 of the Welfare Reform Act of 1971 (Stats. 1971, ch. 578, § 3) which amended section 206 of the Civil Code to read in pertinent part: "It is the duty of the father, the mother, and the children of any person *in need* who is unable to maintain himself by work, to maintain such person to the extent of their ability. . . . A person who is receiving aid to the aged shall be deemed to be a person in need who is unable to maintain himself by work." (Italics added.)

Section 206 prior to its 1971 amendment read in pertinent part as follows: "It is the duty of the father, the mother, and the children of any *poor* person who is unable to maintain himself by work, to maintain such person to the extent of their ability. . . ." (Italics added.)

[5]The relatives' contribution scale is set out in the attached appendix.

[6]Certiorari granted (1964) 379 U.S. 811 [13 L.Ed.2d 26, 85 S.Ct. 39], remanded for further proceedings (1965) 380 U.S. 194 [13 L.Ed.2d 753, 85 S.Ct. 871], and reiterated solely on state grounds (1965) 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321, 20 A.L.R.3d 361].

now § 7275) on an adult child for the care, support and maintenance of her mentally ill parent in a state institution. We rested our opinion in *Kirchner* largely upon *Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247 [28 Cal.Rptr. 718, 379 P.2d 22], where we had declared former section 6650 unconstitutional insofar as it purported to impose liability upon a father for the cost of the care, maintenance and support in a mental institution of his insane son charged with murder. We reasoned in *Hawley* as follows: "The enactment and administration of laws providing for sequestration and treatment of persons in appropriate state institutions —subject of course, to the constitutional guaranties—who would endanger themselves or others if at large is a proper state function; being so, it follows that the expense of providing, operating and maintaining such institutions should (subject to reasonable exceptions against the inmate or his estate) be borne by the state." (*Id.* at pp. 255-256.)

Confronted in *Kirchner* with an attack on the constitutionality of the same statute (former § 6650) challenged in *Hawley,* this court then declared: "Whether the commitment is incidental to an alleged violation of a penal statute, as in *Hawley,* or is essentially a civil commitment as in the instant case, the purposes of confinement and treatment or care in either case encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be *arbitrarily* charged to one class in the society; such assessment violates the equal protection clause." (*Id.* at p. 720; italics added.)

Two years after *Kirchner* in *In re Dudley* (1966) 239 Cal.App.2d 401 [48 Cal.Rptr. 790], the Court of Appeal was faced with the contention that former section 5260 (now § 6715), insofar as it purported to make a parent financially responsible for the care, maintenance and support received by his or her mentally retarded child in a state institution, was unconstitutional for the same reasons for which former section 6650 was declared unconstitutional in *Kirchner*. The court framed the issue before it as follows: "If *Kirchner* stands for the proposition that when the state, in the exercise of its promotion of the general welfare, commits a person either for the protection of society or for his protection or rehabilitation, or any combination thereof, it cannot thereafter seek reimbursement except from such person or his estate, that case then is determinative of the matter in issue. [Fn. omitted.] On the other hand, if *Kirchner* is limited to its facts and does not preclude the state from seeking reimbursement from those otherwise legally responsible for the care, support and maintenance of the

person treated, [fn. omitted] inquiry must be directed to a determination of whether or not respondent is responsible for the support of her adult daughter; and, if so, whether the state has properly provided for the enforcement of any obligation arising from that responsibility." (*Id.* at p. 407.)

The *Dudley* court concluded that *Kirchner* "does not expressly . . . restrict the right to recoupment to the inmate, or his estate, but states that the cost may not *arbitrarily* be charged to one class of persons. Such an arbitrary charge results when liability is imposed on a daughter because of blood relationship alone without regard for the means of the parent patient . . . [or on] a relative who except for the arbitrary statute was in no other manner liable for support of the patient." (Italics added.) (*Id.* at pp. 411-412.) The court observed that in *Kirchner* the inmate mother had adequate funds to pay for her own care and maintenance, that therefore the daughter was not legally responsible for the care and maintenance furnished the mother by the state, since the mother was not a "poor person," and that therein lay the arbitrariness found by the *Kirchner* court.

The Court of Appeal concluded that where the relative, prior to the commitment, was otherwise legally responsible for the care, maintenance and support of the patient, it was not arbitrary to select that class of persons to pay a reasonable contribution to the state for the cost of the state supporting and caring for the patient. Rejecting the contention that the *principle* of section 206 of the Civil Code could not be relied upon to support the constitutionality of the relatives' responsibility statute (former § 5260) then under review, the *Dudley* court relied on our opinion in *County of San Bernardino* v. *Simmons* (1956) 46 Cal.2d 394 [296 P.2d 329], an action against the adult daughter of a poor person to recover a portion of the amount paid as aid to the needy aged under the Old Age Security Law. (Now § 12000 et seq.)

Adverting to our holding in *Simmons* that recovery by public agencies from responsible relatives was completely covered by the Welfare and Institutions Code and was not derived from section 206 of the Civil Code, the *Dudley* court declared: "The problem herein, however, is not in determining whether or not appellant can recover in an action brought solely under the provisions of section 206 of the Civil Code, but whether the existence of the liability thereby created demonstrates that it is not a denial of equal protection of the law to require a person subject to that liability to reimburse the county for the care, which in the absence of that furnished by the state and charged to the county . . . he would otherwise be required to furnish personally." (*In re Dudley, supra,* 239 Cal.App.2d at p. 410.) In short, *Dudley* came to the conclusion that *Kirchner* was not controlling. We denied a hearing in this court.

The *Dudley* analysis of *Kirchner* was followed by the Court of Appeal in *Department of Mental Hygiene* v. *Kolts* (1966) 247 Cal.App.2d 154 [55 Cal.Rptr. 437] which held that the "requirement of section 6650 that the husband support his incompetent wife in a state mental institution is not a denial of equal protection" (*id.* at p. 165); the "classification is reasonably supported by a rational basis" since "the husband is otherwise liable for the support of his incompetent wife." (*Id.* at p. 165.) We denied a hearing in this court. Four years later it was unanimously adopted by this court in *In re Ricky H.* (1970) 2 Cal.3d 513 [86 Cal.Rptr. 76, 468 P.2d 204], which upheld, against an equal protection challenge grounded on *Hawley* and *Kirchner,* the provisions of section 903.1 imposing upon a parent liability for the cost to the county of legal services rendered by the public defender or a court-appointed attorney in juvenile court proceedings. We there held that the imposition of such liability was not arbitrary since "section 903.1 is merely declarative of the parents' preexisting obligation to provide reasonable and necessary support to their minor children . . . ." (*Id.* at p. 521.)

It was against the background of these and similar precedents developed over the seven-year period since our decision in *Kirchner* that we were presented with the constitutional question raised in *County of San Mateo* v. *Boss, supra,* 3 Cal.3d 962 as to the responsible relatives' provisions of the Old Age Security Law. There again it was asserted by the responsible relative that the principles of *Kirchner* rendered the imposition of such liability constitutionally impermissible as a denial of equal protection. We referred in *Boss* to the interpretation placed in *Kirchner* by the various cases in which it was raised and generally agreed that they amounted to this: *Kirchner* does not stand for the proposition that recovery by public agencies under responsible relatives statutes is in all instances violative of equal protection of the laws; on the contrary, recovery may be constitutionally required from persons "otherwise legally responsible" or having a "preexisting duty to support" the recipient of public aid or assistance. In the context of this interpretation we considered the argument made by the county in response to the constitutional attack. In essence it was that Boss, the adult son, had a preexisting duty under Civil Code section 206[7] to support his mother and that this duty provided a rational basis for the imposition of relatives' responsibility under sections 12100 and 12101.

We chose not to reach the latter question in *Boss,* stating that "We

---

[7]Until its revision in 1971, section 206 of the Civil Code provided for a reciprocal duty to support *poor* parents or children; after the revision, the section referred to *needy* parents or children. (See fn. 4, *ante.*)

express no opinion as to whether the duty of support created by Civil Code section 206 provides a sufficient basis for rational classification of those who are required to pay a larger portion of the expense of providing welfare assistance." (3 Cal.3d at p. 971, fn. 8.) Rather we concluded that under the particular facts of that case Boss, the adult son, had no duty under Civil Code section 206 to support his mother since although "in need" and therefore qualified for aid to the aged, she was not a "poor person" within that section. Because he owed his mother no "preexisting duty of support," we found no rational basis for charging him with a portion of the cost of aid to the needy aged and concluded that the relatives' responsibility statutes (§§ 12100, 12101) as applied to him denied him equal protection of the laws.

Apparently in response to our decision in *Boss,* the Legislature, as part of the Welfare Reform Act of 1971, enacted section 3 (Stats. 1971, ch. 578, § 3) which amended section 206 of the Civil Code to read as follows: "It is the duty of . . . the children of any person *in need* who is unable to maintain himself by work, to maintain such person to the extent of their ability. . . . *A person who is receiving aid to the aged shall be deemed to be a person in need who is unable to maintain himself by work.*" (Amended portions italicized.) By virtue of this amendment, all adult children of persons receiving aid to the aged have a duty of support under Civil Code section 206. We are therefore called upon to answer the question which we left open in *Boss,* namely whether liability under Civil Code section 206, as amended, provides a rational basis for imposing liability under the relatives' responsibility statutes so as to preclude denial of equal protection of the laws.

Real parties in interest (hereafter plaintiffs) contend that section 206 does not constitute a "preexisting duty of support" within the meaning of *Boss* for three reasons: (1) that the court in *Kirchner* found Civil Code section 206 not to create a preexisting duty and that this determination is binding precedent under the doctrine of *stare decisis;* (2) that since Civil Code section 206 as amended did not preexist sections 12100 and 12101 in time, it could not create a preexisting duty; and (3) that Civil Code section 206 is not independent of sections 12100 and 12101 and therefore not preexisting in that sense.

Plaintiffs argue that section 206 of the Civil Code was unquestionably applicable to the facts in *Kirchner* and that, therefore, the court necessarily concluded, albeit implicitly, that section 206 did not constitute a preexisting duty. However, since the facts as stated in *Kirchner* specify that the parent's guardianship estate included some $11,000 in cash, it appears that such a

parent would not be a "poor person" within the meaning of Civil Code section 206. (See *County of San Mateo* v. *Boss, supra,* 3 Cal.3d 962, 970-971.) Indeed in our unanimous opinion in *Kirchner,* we neither mention section 206 nor indicate that it was urged upon us as creating a "preexisting duty." Moreover, as discussed, *supra, Dudley* specifically held Civil Code section 206 did provide a rational basis for holding parents responsible for the cost of maintaining their mentally retarded children in state institutions and stated that *Kirchner* specifically involved a case where there was no such other basis for legal responsibility.

Relying on dictionary definitions of "preexisting" (as meaning "to exist beforehand," "to exist prior to"), plaintiffs urge that a "preexisting duty of support" is necessarily one that existed prior in time. Their argument runs as follows: Since Civil Code section 206 was amended in 1971 to impose liability on adult children of *"needy* parents," whereas the relatives' responsibility sections, found in the Welfare and Institutions Code, were enacted in 1937, it is obvious that any duty under Civil Code section 206 did not preexist under Welfare and Institutions Code sections 12100 and 12101. Furthermore, even if "preexisting" is deemed to mean "independent of and separate from," section 206 would not be "preexisting" because its amendment in 1971 was part and parcel of the Welfare Reform Act of 1971 and clearly aimed at overcoming the crucial difference in standards found determinative in *Boss.*

We need not involve ourselves in the metaphysics of "preexistence" or assess the significance, if any, of the seemingly casual use of "preexisting duty" or "preexisting obligation" in opinions dealing with relatives' responsibility. (See, for example, *County of San Mateo* v. *Boss, supra,* 3 Cal.3d 962, 968; *In re Ricky H., supra,* 2 Cal.3d 513, 520; cf. "otherwise liable" in *In re Dudley, supra,* 239 Cal.App.2d 401, 411.) ■ We are satisfied that plaintiffs' arguments may be properly and fully disposed of by a resolution of the broad question posed at the start of this opinion: Does the general duty of children to support their needy parents created by Civil Code section 206 provide a rational basis for the classification of those who are required by law to reimburse the state for aid granted to their aged parents and are thereby compelled to pay a larger portion of the cost of welfare assistance? We conclude that it does.

We refer to *County of San Bernardino* v. *Simmons* (1956) 46 Cal.2d 394 [296 P.2d 329], an action brought against an adult daughter to recover, pursuant to former section 2224[8] from which present section 12100 (see

---

[8]Section 2224 (as amended Stats. 1945, ch. 1319, § 2, p. 2474) provided in pertinent part: "If the person receiving aid has within the State, a spouse or adult child

fn. 2, *ante*) is derived, a portion of the aid to the aged paid by the county to her father. We there held that the authority conferred on counties by the Welfare and Institutions Code to obtain reimbursement from responsible relatives of the recipients of such aid was entirely independent of, and not subrogated from, former (see fn. 4, *ante*) Civil Code section 206. We said in pertinent part: "There is nothing in section 206 which suggests an intention to create a liability of the child of poor parents to public agencies which support the parents in accord with their law-imposed duty to pay aid to such parents; the only liability to third persons is in the case of the promise of an adult child expressly referred to in the last sentence of the section.[9] On the other hand, the Welfare and Institutions Code . . . not only purports to state the circumstances in which the named responsible relatives are liable to the county when it has supported or paid aid to indigents, aged, blind, etc., but also states a procedure by which in proper cases the county can recover from the responsible relatives. It seems apparent, therefore, that the Legislature intended, by the Welfare and Institutions Code to cover completely the subject of recovery by public agencies from responsible relatives, and that it did not intend to create, and that there is no proper basis for the courts to innovate, a right of recoupment derived from section 206 of the Civil Code. [Fn. omitted.]

"On this subject it is said in *County of Contra Costa* v. *Lasky* (1954), *supra,* 43 Cal.2d 506, 509 [275 P.2d 452], 'There is a conflict in the cases as to whether the basic liability of responsible relatives is section 206 of the Civil Code or the provisions of the Welfare and Institutions Code. It has been held that the latter code provisions are complete in themselves and the liability of responsible relatives to the county is thereby established. (*County of Lake* v. *Forbes* (1941) 42 Cal.App.2d 744 . . .; *County of Los Angeles* v. *Lane* (1952) 113 Cal.App.2d 476 . . .; *County of Los Angeles* v. *La Fuente* (1942) 20 Cal.2d 870 . . . .) Seemingly to the contrary are *Garcia* v. *Superior Court* (1941) 45 Cal.App.2d 31 . . . and *Kelley* v. *State Board of Social Welfare* (1947) 82 Cal.App. 2d 627 . . . . Although it is not important in this case, we believe the matter is adequately covered by the Welfare and Institutions Code and it is the

---

found by the board of supervisors pecuniarily able to support said person, the board of supervisors shall request the district attorney . . . to proceed against such kindred . . . [T]he district attorney . . . shall, on behalf of said county, maintain an action, in the superior court of the county granting such aid, against said relative . . . to recover for said county such portion of the aid granted as said relative is able to pay . . . ."

[9]The 1971 revision of Civil Code section 206 retained in identical language the provision of former section 206 that "The promise of an adult child to pay for necessaries previously furnished to such parent is binding."

measure of the extent of the responsible relative's liability to the county. It is to it we must look to ascertain whether the relative is required, in a particular case, to reimburse the county.' We reiterate the declaration of the last quoted sentence as a holding, and any inconsistent implications in the *Garcia* and the *Kelley* cases are disapproved." (*Id.* at pp. 398-399; fn. omitted.)

We therefore reaffirm as to the sections of the Welfare and Institutions Code now in effect imposing liability upon responsible relatives (§§ 12100, 12101, see fns. 2 and 3, *ante*) what we held in *Simmons* as to their statutory predecessors. Accordingly we hold that sections 12100 and 12101 are entirely independent of Civil Code section 206, and that the right of the county granting aid to the aged "to recover that portion of the aid granted as it is determined that the child is liable to pay" (§ 12100, 1st par.) is created solely by the pertinent sections of the Welfare and Institutions Code and does not devolve upon the county by subrogation of any right which the parent may have against the child under Civil Code section 206. It is manifest, then, that the liability of the child now being subjected to constitutional scrutiny is that imposed by sections 12100 and 12101 in themselves. It is equally clear that the rationality of the basis for such liability does not and should not depend upon the exact subrogation of an *individual* duty, factually established, under Civil Code section 206.

 ██ ██ Therefore, the real question which *Kirchner* raises in the instant case is whether the class of adult children in *general* are otherwise under a duty to support needy or poor parents which duty provides a rational basis for upholding the relatives' responsibility created by sections 12100 and 12101 against the challenge that such statutes are impermissibly discriminating. We answer this question in the affirmative.[10]

It is abundantly clear that children have generally been subject to a duty to support poor parents for a very long time, indeed. It is true, as stated in *Kirchner* and *Boss,* that there was no such duty at common law. Nevertheless, the duty is deep rooted and of venerable ancestry; it can be traced back over almost four centuries to the year 1601, when it emerged

---

[10]As stated earlier, we declined to reach this question in *Boss* (see 3 Cal.3d at p. 971, fn. 8) but chose rather to resolve the liability of the adult child in that case on an individual basis. To the extent that *County of San Mateo* v. *Boss, supra,* 3 Cal.3d 962 is inconsistent with our views and holding herein, it is overruled. We emphasize that since we now conclude that sections 12100 and 12101 constitutionally impose liability on all persons within the class of children of those receiving aid to the aged, *Boss* should no longer be followed in determining the liability of such children on an individual basis. We now hold that the liability is constitutionally imposed on all chldren.

as part and parcel of the Elizabethan Poor Law. (43 Eliz. 1, ch. 2, § vi (1601).)[11] Professor tenBroek has clearly demonstrated that "legal liability of relatives [imposed by the Elizabethan Poor Law] was designed to indemnify the public and to minimize its costs in relieving the poor." (tenBroek, *supra,* 16 Stan.L.Rev. 257, 283.)

This duty, codified in California in 1872 as section 206 of the Civil Code in language remarkably similar to the Elizabethan Poor Law, has existed unchanged until the recent 1971 amendment. (See fn. 4, *ante.*) The purpose of such legislation is identical to that underlying the Elizabethan Poor Law: "It has been stated that the 'main purpose of the statutes seems to be to protect the public from the burden of supporting people who have children able to support them.' (*Duffy* v. *Yordi, supra,* 149 Cal. at p. 142 [citation]." (*Gluckman* v. *Gaines* (1968) 266 Cal.App.2d 52, 54 [71 Cal.Rptr. 795].)

In 1930 the state undertook to support needy aged by inaugurating the present state-county old age assistance program. (Stats. 1929, ch. 530.) Aged persons, however, who had children able to support them and responsible under the law for their support were specifically excluded from the system. (Stats. 1929, ch. 530, § 2(g).) Apparently the Legislature determined that aged persons who had children were adequately protected by the existing provision in Civil Code section 206.

In 1937 the Legislature slightly modified the statutory scheme. Only aged persons who were actually receiving support from responsible relatives, including children, were disqualified from receiving aid. (Stats. 1937, ch. 405, § 2(f).) Aged persons not receiving such support but having responsible relatives, including children, who were able and legally responsible to provide support, were unconditionally entitled to receive aid. However, the county granting aid was allowed to recover from "a spouse or adult child pecuniarily able to support" a person receiving aid "such portion of the aid granted as said relative is able to pay." (Stats. 1937, ch. 405, § 5.) This statutory scheme continues today in substantially the same form.

It is thus abundantly clear that a long tradition of law, not to mention a measureless history of societal customs, has singled out adult children to

---

[11]"[The parents, grandparents, and the children of] everie poore olde blind lame and impotente *person,* or other poore *person* not able to worke, beinge of a sufficient abilitie, shall at their owne Chardges releive and maintaine everie suche poore *person,* in that manner and accordinge to that rate, as by the Justices of the Peace of that Countie where suche sufficient *persons* dwell, or the greater number of them, at their generall Quarter-Sessions shalbe assessed; upon paine that everie one of them shall forfeite twenty shillings for everie monthe which they shall faile therein." (Fn. omitted.) (tenBroek, *California's Dual System of Family Law: Its Origin, Development, and Present Status, Part I* (1964) 16 Stan.L.Rev. 257, 283.)

bear the burden of supporting their poor parents. This duty existed prior to, and independent of, any duties arising out of the state assistance to the aged. Subsequent statutes imposing liability upon the adult children of persons receiving aid to the aged merely selected a class of relatives who were otherwise legally responsible for the support of their parents. The fact that the Legislature in 1971 changed the standard from "poor persons unable to maintain themselves by work" to "needy persons unable to maintain themselves by work" in no way affects or changes this conclusion.

Plaintiffs argue that although adult children may be otherwise legally responsible to support their poor or needy parents and the rule announced in *Kirchner* is thus satisfied, the imposition on such class of both the basic duty to support under Civil Code section 206 and the statutory liability to reimburse the county under sections 12100 and 12101 remains arbitrary and violative of the equal protection of the laws. While pressing their attack against both the Civil Code and the Welfare and Institutions Code sections, plaintiffs at this point are in reality concentrating on the objective of undermining section 206.[12] In essence, they claim that all three sections must succumb to the "strict scrutiny" delineated by us in *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241].[13]

Plaintiffs, apparently recognizing that these sections do not touch on or affect a "fundamental interest," argue that the statute creates a suspect classification on two separate theories: (1) by distinguishing between people on the basis of wealth; and (2) by distinguishing between people on the basis of ancestry.

---

[12]Plaintiffs' argument is directed against the state's right to select adult children as a class to bear the burden of supporting their needy parents both under section 206 of the Civil Code and sections 12100 and 12101 of the Welfare and Institutions Code. It is clear that the state has adopted as a matter of basic policy the position that needy aged people who have adult children should be supported by these children if and to the extent that these children are able to bear the burden. The county provides no support to those aged whose children have voluntarily met this obligation. But it does grant aid to those needy aged with children who are unwilling to meet their obligation voluntarily. In such a case, however, the county is given the right to collect reimbursement from those children already legally responsible to support these recipients.

[13]" 'In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.] [Par.] On the other hand, in cases involving "suspect classifications" *or* touching on "fundamental interests" [fns. omitted] the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' [Citations.]"

While it is indisputable that " 'careful examination on our part is especially warranted where lines are drawn on the basis of wealth . . . .' " (*Serrano* v. *Priest, supra,* 5 Cal.3d 584, 597), it is equally clear that these sections do not draw lines on the basis of wealth. They apply to all adult children of parents in need. They draw no distinction between such children and do not single out either wealthy children or poor children for special treatment, except to provide that parent and children shall bear the duty of support "to the extent of their ability." (Civ. Code, § 206.)

Plaintiffs claim, however, that these sections discriminate between adult children on the basis of their *parents'* wealth, since only adult children of "parents in need" are required to support their parents. While this argument has a surface plausibility and appears to establish that these sections create a suspect classification based on wealth, a closer examination exposes the argument as pure sophistry.

The class "parents in need" is the only class in which the state has an interest or to which it owes a duty. As we observed in *Boss,* "We also note that in his excellent discussion of the development of the California family law, Professor tenBroek establishes that Civil Code section 206 as well as the various provisions of the Welfare and Institutions Code which impose liability on relatives are derived from the Elizabethan Poor Law (43 Eliz. 1, ch. 2 (1601)) and that all of these provisions were developed to relieve the public treasury of part of the burden cast upon it by the public assumption of responsibility to maintain the destitute. [Citations.]" (3 Cal.3d 962, 971, fn. 8.) The state interest advanced, namely to offset the cost of public assistance to the needy comes into play only when the needy are involved and therefore focuses only on a class of needy people. However, insofar as the state acts toward this class of needy people, it is conferring a benefit upon them either by directly granting aid under the Old Age Security Law or by providing them with the remedy to secure support from their adult children under Civil Code section 206. Plaintiffs do not contend that the state acts improperly in conferring such a benefit only upon "parents in need." Insofar as the state imposes a correlative liability upon the adult children of "parents in need," it does so without discriminating between such children on the basis of wealth. The state selects the children to bear the burden not on the basis of wealth, but on the basis of parentage. Since these sections do not discriminate on the basis of wealth, it creates no suspect classification based on wealth.

Plaintiffs urge that ancestry is a suspect classification calling for application of the "strict scrutiny" test. They cite no cases directly so holding but call our attention to the following language in *Hirabayashi* v.

*United States* (1943) 320 U.S. 81, 100 [87 L.Ed. 1774, 1786, 63 S.Ct. 1375]: "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." However, it is abundantly clear that the court used ancestry to denote racial classification and not in the general sense of parentage. The court continued in the following sentence: "For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection." In *Oyama* v. *California* (1948) 332 U.S. 633, 646 [92 L.Ed. 249, 259, 68 S.Ct. 269], the court referred to *Hirabayashi* as abrogating "discrimination between citizens on the basis of their racial descent." Moreover, if classifications based on the general fact of descent, as opposed to racial classification, were viewed as suspect, established areas of the law, as for example the statutes of succession, would be undermined.

■ Since these sections[14] do not touch upon a fundamental interest and do not create any suspect classifications, their constitutionality is to be determined by the normal "rational relationship" test, namely by " 'requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivably legitimate state purpose.' " (*Serrano* v. *Priest, supra,* 5 Cal.3d at p. 597.)

■ As indicated earlier, we recognized in *Boss* that the state purpose of the relatives' responsibility statutes is to "relieve the public treasury of part of the burden cast upon it by the public assumption of responsibility to maintain the destitute." It is uncontested that this is a legitimate state purpose. (*Bullock* v. *Carter* (1972) 405 U.S. 134, 147 [31 L.Ed.2d 92, 102, 92 S.Ct. 849].) The sole question therefore is whether placing the burden for this support upon the adult children bears some rational relationship to the accomplishment of the state purpose of relieving the public treasury.

It seems eminently clear that the selection of the adult children is rational on the ground that the parents, who are now in need, supported and cared for their children during their minority and that such children should in return now support their parents to the extent to which they are capable. Since these children received special benefits from the class of "parents in need," it is entirely rational that the children bear a special burden with respect to that class.[15]

---

[14]Sections 12100 and 12101; Civil Code section 206. (See fns. 2, 3 and 4, *ante.*)

[15]In apparent recognition of this rationale, section 12104 provides that adult children who were abandoned for two years during their minority are exempt from the reimbursement duty.

Plaintiffs argue, however, that the only support obligations which are rational are those arising out of a relationship voluntarily entered into, as for example marriage and parental relationship, because there the prospective husband or parent knows of the obligations attendant upon entering the relationship and voluntarily consents thereto. On the contrary, so the argument runs, since children do not themselves voluntarily enter into the relationship with their parents, it is arbitrary to force upon them the obligations of such relationship.

Assuming that normally a child has no choice in the creation of a relationship with his parents, this fact does not per se establish that the classification is arbitrary as to children. Indeed, as we have explained, the existence of special benefits for the class arising out of the relationship provides an adequate basis for imposing upon it a duty to support parents. In short we find nothing arbitrary in the delineation of the classes upon which responsibility is imposed by Civil Code section 206 or by sections 12100 and 12101.

We therefore arrive at these final conclusions. The provisions of the Old Age Security Law (§§ 12100 and 12101) requiring adult children to contribute to the support of their parents do not thereby arbitrarily charge to one class in society the cost of public assistance to the aged who are poor or in need. A rational basis for such classification is found in, and provided by, Civil Code section 206, which itself rests soundly on our Anglo-American legal tradition. Accordingly the liability imposed by the Old Age Security Law on responsible relatives does not deny them the equal protection of the laws. Since these provisions pass constitutional muster,[16] they are entitled to enforcement and respondent court acts in excess of its jurisdiction in restraining and enjoining petitioner from enforcing them against real parties in interest and the class or classes of persons they purport to represent.

We are not unmindful that these provisions may involve harsh results in certain instances and we are indeed sympathetic with the plight of such persons. However, the amelioration of any harsh results must rest in the

---

[16]We find no merit in real parties' contention that the provisions constitute an "under-inclusive" classification since similar liability is not imposed on relatives of recipients of aid to the blind and aid to the totally disabled. In the area of economic regulation, the Legislature may, generally speaking, proceed in piecemeal fashion. Nor do we find any merit in real parties' claim, unsupported by any direct authority, that the above provisions offend constitutional principles because they strike at the "sanctity and privacy" of the family relationship. We deem neither claim worthy of extended discussion.

hands of the administering authorities, since these provisions are constitutional.

Let a peremptory writ of prohibition issue as prayed for.

Wright, C. J., McComb, J., and Burke, J., concurred.

APPENDIX

THE RELATIVES' CONTRIBUTION SCALE OF THE WELFARE AND INSTITUTIONS CODE SECTION 12101, UNTIL OCTOBER 1, 1971, PROVIDED:

Relatives' Contribution Scale

| A. Net monthly income | B. Number of persons dependent upon income | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 or more |
| | C. Maximum required monthly contributions | | | | | |
| $ 400 or under ... | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| 401–$ 450 ..... | 5 | 0 | 0 | 0 | 0 | 0 |
| 451– 500 ..... | 10 | 0 | 0 | 0 | 0 | 0 |
| 501– 550 ..... | 15 | 0 | 0 | 0 | 0 | 0 |
| 551– 600 ..... | 20 | 0 | 0 | 0 | 0 | 0 |
| 601– 650 ..... | 25 | 5 | 0 | 0 | 0 | 0 |
| 651– 700 ..... | 30 | 10 | 0 | 0 | 0 | 0 |
| 701– 750 ..... | 35 | 15 | 0 | 0 | 0 | 0 |
| 751– 800 ..... | 40 | 20 | 0 | 0 | 0 | 0 |
| 801– 850 ..... | 45 | 25 | 5 | 0 | 0 | 0 |
| 851– 900 ..... | 50 | 30 | 10 | 0 | 0 | 0 |
| 901– 950 ..... | 55 | 35 | 15 | 0 | 0 | 0 |
| 951– 1,000 ..... | 60 | 40 | 20 | 0 | 0 | 0 |
| 1,001– 1,025 ..... | 65 | 45 | 25 | 5 | 0 | 0 |
| 1,026– 1,050 ..... | 70 | 50 | 30 | 10 | 0 | 0 |
| 1,051– 1,075 ..... | 75 | 55 | 35 | 15 | 0 | 0 |
| 1,076– 1,100 ..... | 80 | 60 | 40 | 20 | 0 | 0 |
| 1,101– 1,125 ..... | 85 | 65 | 45 | 25 | 5 | 0 |
| 1,126– 1,150 ..... | 90 | 70 | 50 | 30 | 10 | 0 |

APPENDIX

THE RELATIVES' CONTRIBUTION SCALE OF THE WELFARE AND INSTITUTIONS
CODE SECTION 12101, EFFECTIVE OCTOBER 1, 1971, PROVIDED:

Relatives' Contribution Scale

| A. Net monthly income | B. Number of persons dependent upon income | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 or more |
| | C. Maximum required monthly contributions | | | | | |
| $ 350 or under ... | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| 351–$ 375 ..... | 20 | 0 | 0 | 0 | 0 | 0 |
| 376– 400 ..... | 25 | 0 | 0 | 0 | 0 | 0 |
| 401– 425 ..... | 30 | 20 | 0 | 0 | 0 | 0 |
| 426– 450 ..... | 35 | 25 | 0 | 0 | 0 | 0 |
| 451– 475 ..... | 40 | 30 | 20 | 0 | 0 | 0 |
| 476– 500 ..... | 45 | 35 | 25 | 0 | 0 | 0 |
| 501– 525 ..... | 50 | 40 | 30 | 20 | 0 | 0 |
| 526– 550 ..... | 55 | 45 | 35 | 25 | 0 | 0 |
| 551– 575 ..... | 60 | 50 | 40 | 30 | 20 | 0 |
| 576– 600 ..... | 65 | 55 | 45 | 35 | 25 | 0 |
| 601– 625 ..... | 70 | 60 | 50 | 40 | 30 | 20 |
| 626– 650 ..... | 75 | 65 | 55 | 45 | 35 | 25 |
| 651– 675 ..... | 80 | 70 | 60 | 50 | 40 | 30 |
| 676– 700 ..... | 85 | 75 | 65 | 55 | 45 | 35 |
| 701– 725 ..... | 90 | 80 | 70 | 60 | 50 | 40 |
| 726– 750 ..... | 95 | 85 | 75 | 65 | 55 | 45 |
| 751– 775 ..... | 100 | 90 | 80 | 70 | 60 | 50 |
| 776– 800 ..... | 105 | 95 | 85 | 75 | 65 | 55 |
| 801– 825 ..... | 110 | 100 | 90 | 80 | 70 | 60 |
| 826– 850 ..... | 115 | 105 | 95 | 85 | 75 | 65 |
| 851– 875 ..... | 120 | 110 | 100 | 90 | 80 | 70 |
| 876– 900 ..... | 125 | 115 | 105 | 95 | 85 | 75 |
| 901– 925 ..... | 130 | 120 | 110 | 100 | 90 | 80 |
| 926– 950 ..... | 135 | 125 | 115 | 105 | 95 | 85 |
| 951– 975 ..... | 140 | 130 | 120 | 110 | 100 | 90 |
| 976– 1,000 ..... | 145 | 135 | 125 | 115 | 105 | 95 |
| 1,001– 1,025 ..... | 150 | 140 | 130 | 120 | 110 | 100 |
| 1,026– 1,050 ..... | 155 | 145 | 135 | 125 | 115 | 105 |
| 1,051– 1,075 ..... | 160 | 150 | 140 | 130 | 120 | 110 |
| 1,076– 1,100 ..... | 165 | 155 | 145 | 135 | 125 | 115 |
| 1,101– 1,125 ..... | 170 | 160 | 150 | 140 | 130 | 120 |
| 1,126– 1,150 ..... | 175 | 165 | 155 | 145 | 135 | 125 |

THE RELATIVES' CONTRIBUTION SCALE OF THE WELFARE AND INSTITUTIONS CODE SECTION 12101, AS AMENDED BY THE DEPARTMENT OF SOCIAL WELFARE EFFECTIVE MARCH 21, 1973, PROVIDED:

Relatives' Contribution Scale

| A — If relative is 60 years old or older and gross monthly income is: | B — If relative is under 60 years old and gross monthly income is: | C — Then net monthly income is: | D — Maximum required monthly contribution if number of persons dependent upon income is: | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 | 6 or more |
| $ 0 – 1,001.99 | $ 0 – 667.99 | $ 500 or under | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| 1,002.00– 1,051.99 | 668.00– 701.33 | 501– 525 | 20 | 10 | 0 | 0 | 0 | 0 |
| 1,052.00– 1,101.99 | 701.34– 734.66 | 526– 550 | 25 | 15 | 0 | 0 | 0 | 0 |
| 1,102.00– 1,151.99 | 734.67– 767.99 | 551– 575 | 30 | 20 | 0 | 0 | 0 | 0 |
| 1,152.00– 1,201.99 | 768.00– 801.33 | 576– 600 | 35 | 25 | 5 | 0 | 0 | 0 |
| 1,202.00– 1,251.99 | 801.34– 834.66 | 601– 625 | 40 | 30 | 10 | 5 | 0 | 0 |
| 1,252.00– 1,301.99 | 834.67– 867.99 | 626– 650 | 45 | 35 | 15 | 10 | 5 | 0 |
| 1,302.00– 1,351.99 | 868.00– 901.33 | 651– 675 | 50 | 40 | 20 | 15 | 10 | 0 |
| 1,352.00– 1,401.99 | 901.34– 934.66 | 676– 700 | 55 | 45 | 25 | 20 | 15 | 5 |
| 1,402.00– 1,451.99 | 934.67– 967.99 | 701– 725 | 60 | 50 | 30 | 25 | 20 | 10 |
| 1,452.00– 1,501.99 | 968.00– 1,001.33 | 726– 750 | 65 | 55 | 35 | 30 | 25 | 15 |
| 1,502.00– 1,551.99 | 1,001.34– 1,034.66 | 751– 775 | 70 | 60 | 40 | 35 | 30 | 20 |
| 1,552.00– 1,601.99 | 1,034.67– 1,067.99 | 776– 800 | 75 | 65 | 45 | 40 | 35 | 25 |
| 1,602.00– 1,651.99 | 1,068.00– 1,101.33 | 801– 825 | 80 | 70 | 50 | 45 | 40 | 30 |
| 1,652.00– 1,701.99 | 1,101.34– 1,134.66 | 826– 850 | 85 | 75 | 55 | 50 | 45 | 35 |
| 1,702.00– 1,751.99 | 1,134.67– 1,167.99 | 851– 875 | 90 | 80 | 60 | 55 | 50 | 40 |
| 1,752.00– 1,801.99 | 1,168.00– 1,201.33 | 876– 900 | 95 | 85 | 65 | 60 | 55 | 45 |
| 1,802.00– 1,851.99 | 1,201.34– 1,234.66 | 901– 925 | 100 | 90 | 70 | 65 | 60 | 50 |
| 1,852.00– 1,901.99 | 1,234.67– 1,267.99 | 926– 950 | 105 | 95 | 75 | 70 | 65 | 55 |
| 1,902.00– 1,951.99 | 1,268.00– 1,301.33 | 951– 975 | 110 | 100 | 80 | 75 | 70 | 60 |
| 1,952.00– 2,001.99 | 1,301.34– 1,334.66 | 975– 1,000 | 115 | 105 | 85 | 80 | 75 | 65 |
| 2,002.00– 2,051.99 | 1,334.67– 1,367.99 | 1,001– 1,025 | 125 | 115 | 95 | 90 | 80 | 75 |
| 2,052.00– 2,101.99 | 1,368.00– 1,401.33 | 1,026– 1,050 | 135 | 125 | 105 | 100 | 90 | 85 |
| 2,102.00– 2,151.99 | 1,401.34– 1,434.66 | 1,051– 1,075 | 145 | 135 | 115 | 110 | 100 | 95 |
| 2,152.00– 2,201.99 | 1,434.67– 1,467.99 | 1,076– 1,100 | 155 | 145 | 125 | 120 | 110 | 105 |
| 2,202.00– 2,251.99 | 1,468.00– 1,501.33 | 1,101– 1,125 | 165 | 155 | 135 | 130 | 120 | 110 |
| 2,252.00– 2,301.99 | 1,501.34– 1,534.66 | 1,126– 1,150 | 175 | 165 | 145 | 130 | 120 | 115 |

**TOBRINER, J.**—I dissent.

The majority propose, by the instant opinion, to establish a new constitutional standard for determining when the state may compel some of its citizens to pay for benefits which the state, in its wisdom, decides to provide to other citizens. Under the test proposed by the majority, a state can charge one class of citizens with the costs of providing public programs to another class whenever there is simply some "rational relationship" between the group of benefited individuals and those who must pay the bill. Applying this "minimal rationality" test in the instant case, the majority hold that since the class of·children have generally benefited from parents, the state can require those children whose parents happen to be poor to reimburse the state for the cost of public old age assistance, regardless of whether a particular child is otherwise legally obligated to provide such support to his parent.

This proposed holding not only squarely overrules our court's very recent unanimous decision in *County of San Mateo* v. *Boss* (1971) 3 Cal.3d 962 [92 Cal.Rptr. 294, 479 P.2d 654], as the majority obliquely intimate (see *ante,* p. 502, fn. 10), but additionally is irreconcilable with this court's seminal decision in *Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353], with the reasoning of *In re Ricky H.* (1970) 2 Cal.3d 513 [86 Cal.Rptr. 76, 468 P.2d 204] and *In re Dudley* (1966) 239 Cal.App.2d 401 [48 Cal.Rptr. 790] and, indeed, with every recent California precedent in this area,[1] authorities upon which the majority purport to rely. As I shall explain, the prior decisions establish that under our state constitutional guarantee of equal protection of the laws (Cal. Const., art. I, §§ 11, 21) the state may seek reimbursement for the costs of public programs from a relative of a benefited person *only when the relative would have been legally responsible for providing such service even if the state had not undertaken its public program.* By the instant opinion, the majority have discarded the legal analysis which has guided California courts in this field for the past decade.

Moreover, the rationale underlying the majority opinion represents not only a sharp break with precedent but, more fundamentally, a dangerous inroad into basic principles of individual freedom and minority rights

---

[1]E.g., *Guardianship of Hicks* (1964) 228 Cal.App.2d 629, 632 [39 Cal.Rptr. 698] (upholding right of state to obtain reimbursement from benefited individual's own estate); *Estate of Preston* (1966) 243 Cal.App.2d 803 [52 Cal.Rptr. 790] (same); *Department of Mental Hygiene* v. *Kolts* (1966) 247 Cal.App.2d 154, 163 [55 Cal. Rptr. 437] (upholding reimbursement provision as applied to spouse of beneficiary); *County of Alameda* v. *Kaiser* (1965) 238 Cal.App.2d 815 [48 Cal.Rptr. 343] (upholding reimbursement provision as applied to parent of minor beneficiary).

which have long flourished in this state. The majority opinion greatly expands the power of the state to foist general expenses onto the shoulders of small classes of citizens, permitting the majority, by a unilateral decision to provide certain benefits to some of its citizens, to require a designated minority to bear expenses for which they would otherwise not be responsible. As the few examples described below illustrate, acceptance of the majority's new constitutional analysis would open the door to a wide abuse of majoritarian power.

Instead of adopting this unprecedented approach, I believe the court should continue to apply the standard that has been established by California cases to date. Under this test, the state may properly seek reimbursement for expenses of a public program from a class of individuals who do not directly receive the benefit of the program only when such individuals bear a legal duty to provide such services which duty exists independently of the state's decision to initiate its program. As discussed below, applying this test to the "relative responsibility" provisions at issue in the instant case, I conclude that the challenged provisions are invalid, both because an adult child's legal duty to support poor parents is not "independent" of the state's decision to provide welfare benefits and because the section works an invidious discrimination against poor families as a class. I therefore believe that the decision of the superior court, granting a temporary injunction to restrain the enforcement of the challenged provisions, should be affirmed.

1. *The majority's holding conflicts with* Dept. of Mental Hygiene v. Kirchner *(1964) 60 Cal.2d 716 and all of the subsequent California decisions adjudicating similar "relative responsibility" provisions.*

I begin my analysis with a chronological review of the considerable California case law which frames the instant controversy. As the majority recognize, *Dept. of Mental Hygiene v. Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353] represents the seminal decision in the line of recent California cases determining the propriety of a variety of "relative responsibility" provisions. In *Kirchner,* the State Department of Mental Hygiene, acting pursuant to former section 6650 (now § 7275) of the Welfare and Institutions Code, brought an action to recover the costs of care, support, maintenance and medical attention (some $7,554) incurred on behalf of a patient of a state mental institution against the estate of the patient's adult child. Pointing out that the patient-parent herself had a personal estate of $11,000, the guardian of the adult child's estate challenged section 6650 as a denial of equal protection. The trial

court upheld the state agency's claim but our court reversed, holding that by imposing liability upon the estate of an adult child, the section "arbitrarily charged to one class in the society" the cost of maintaining the state institution. (60 Cal.2d at p. 720.)

Although the precise rationale of the *Kirchner* opinion is somewhat ambiguous, two distinct threads run throughout the decision. First, relying on *Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247 [28 Cal. Rptr. 718, 379 P.2d 22], the *Kirchner* court stressed the public nature of the function served by state mental institutions and observed that in general the expense of maintaining such a public institution should be borne by the public generally and could not arbitrarily be charged to a single class within the society. Second, the court noted in *Kirchner* that the patient herself had an estate of $11,000, adequate to cover the costs sought to be recovered from her daughter's estate, and that the state sought to impose such liability on the child without giving the child any correlative right of recoupment from, or control over, the patient's own assets. Under these circumstances, the court concluded that section 6650's imposition of liability upon the adult child "manifestly denies him equal protection of the law." (60 Cal.2d at p. 723.)

The holding proposed by the majority in the instant case is completely irreconcilable with the result reached in *Kirchner*. The majority conclude that regardless of the circumstances of any particular child or parent, since children *as a class* have benefited from parents, it is permissible to charge all children for the support of parents. If the *Kirchner* court had applied this reasoning, it would have *upheld* the application of section 6650 on the facts of that case, for just as in the instant case, the state in *Kirchner* was seeking reimbursement from an adult child for public services provided to a parent. Since *Kirchner* did not uphold the statute but instead invalidated section 6650, the majority's present holding effectively overrules *Kirchner*.

The next case in the series of "relative responsibility" decisions, and the one ostensibly relied on most extensively by the majority, is the Court of Appeal decision in *In re Dudley* (1966) 239 Cal.App.2d 401 [48 Cal.Rptr. 790]. In *Dudley*, a parent who had placed her adult mentally retarded daughter in a state institution challenged the constitutionality of former section 5260 (now § 6715), which imposed upon parents financial liability for the costs of the care, maintenance and support afforded their retarded children by the state.

In rejecting the parent's argument that *Kirchner* had invalidated all

statutes which charged "responsible relatives" for the cost of public programs, the *Dudley* court noted first that *Kirchner* had not disapproved earlier decisions permitting the state to charge such costs to the patient or his estate, and then declared that "[*Kirchner*] does not . . . restrict the right to recoupment to the inmate, or his estate, but states that the cost may not arbitrarily be charged to one class of persons. *Such arbitrary charge results when liability is imposed on a daughter because of blood relationship alone without regard for the means of the parent-patient or the resources of the daughter. . . .* In *Kirchner* the court rejected the attempt to shift the cost of the maintenance of the patient from the state and the patient's estate to a relative who *except for the arbitrary statute* was in no other manner liable for the support of the patient. Herein, on the other hand, the parent, *prior to the commitment,* was subject to the expense of such care, support and maintenance as she furnished her daughter. She voluntarily appealed to the state, which in turn assumed *her obligations* upon terms which included reasonable contribution to the cost thereof." (Italics added.) (239 Cal.App.2d at pp. 411-412.) Under these circumstances, the *Dudley* court held that the state could properly charge the parent for the costs of supporting her adult child in a state institution.

Although the majority purport to rely heavily on the reasoning of *Dudley,* the quoted passage clearly reveals that the broad rationale of the present opinion is inconsistent with *Dudley.* Whereas the majority suggest that it is rational, and hence permissible, to require *all children* to support poor parents because children as a class have been supported by parents, and that it is neither necessary nor proper to look to the individual circumstances of a particular child, the *Dudley* court declared that a relative responsibility provision is "arbitrary . . . when liability is imposed on a daughter because of blood relationship alone without regard for the means of the parent-patient or the resources of the daughter." By declaring the circumstances of the individual child irrelevant, the majority now approve of just such an "arbitrary" charge.

The key to the *Dudley* opinion lies in its observation that "prior to the commitment" of her daughter to a state institution, the petitioning parent had the legal duty to support her ill child; since the parent ostensibly bore this obligation without regard to the state's decision to provide its medical treatment the parent could reasonably be required to continue this same support after commitment. The *Dudley* court emphasized, however, that the state could not rely on a legal obligation of the parent created by the "arbitrary statute" itself; the legal responsibility of the relative had to exist independently of the state's reimbursement statutory scheme. The majority opinion ignores this reasoning of the *Dudley* court.

The foregoing analysis of *Dudley* is borne out by this court's 1970 decision in *In re Ricky H.* (1970) 2 Cal.3d 513 [86 Cal.Rptr. 76, 468 P.2d 204]. In *Ricky H.,* a parent contended that under *Kirchner* it was unconstitutional to require him to reimburse the state for the cost of furnishing his minor child with a court-appointed attorney in juvenile proceedings. In analyzing this contention, the *Ricky H.* court reviewed *Dudley* and the numerous other Court of Appeal opinions following *Kirchner* (see fn. 1, *supra*), and concluded that the critical question was whether the parent had an obligation to pay for his child's legal expenses which existed without regard to the state's decision to furnish counsel. The court reasoned: "[I]f the expenses incurred in procuring counsel to represent the minor in juvenile court proceedings are properly chargeable to the parents as an element of their preexisting support obligation, the reasoning of the foregoing cases should apply, and [Welfare and Institutions Code] section 903.1 should be upheld." (2 Cal.3d at p. 520.)

The *Ricky H.* court then analyzed the nature of attorney's fees to determine whether they were "necessaries" for which parents would generally be liable. Finding that such legal expenses of a minor child were necessaries, the court upheld the reimbursement provision of section 903.1, stating: "We conclude that section 903.1 is merely declarative of the parents' preexisting obligation to provide reasonable and necessary support to their minor children, and to reimburse third persons providing that support upon the parents' failure to do so. [Citation.] *Consequently,* the imposition of liability for counsel fees under section 903.1 cannot be characterized as arbitrary or a denial of equal protection of the laws." (Italics added.) (2 Cal.3d at p. 521.)

The significance of the legal analysis undertaken in *Ricky H.* is that it reveals once again the unprecedented character of the present majority opinion. Under the majority's proposed approach, the relevant question in *Ricky H.* would not have been whether the parents were under a preexisting duty to provide legal counsel for their child but, instead, would have been simply whether there was a "rational relation" between parents and children which could justify charging parents with the costs of counsel which the state chose to provide to children. Inasmuch as parents generally voluntarily choose to bring children into this world, the mere "rational relationship" envisioned by the majority would obviously be present; thus, under the majority's suggested test the parents' liability in *Ricky H.* would have followed whether or not legal fees constituted reasonable or necessary expenses which the parents were otherwise liable to provide. Since *Ricky H.* concluded, however, that parents' liability could be sustained *only* because counsel fees did fall within the parents' preexisting support obli-

gation, it is clear that the majority have substantially departed from the *Ricky H.* decision.

Finally, this court's most recent opinion in *County of San Mateo* v. *Boss* (1971) 3 Cal.3d 962 [92 Cal.Rptr. 294, 479 P.2d 654] demonstrates once again the majority's break with precedent. In *Boss,* as in the instant case, the state sought reimbursement from an adult child for the costs of providing his parent welfare benefits under the Old Age Security Law. After reviewing the extensive case law discussed above, the *Boss* court summarized the holdings: "In each of these cases [permitting reimbursement], it was found that the person upon whom liability was imposed owed a preexisting duty of support to the recipient of the public assistance. Since the state discharges that duty of support to the extent it provides welfare assistance, it may reasonably seek reimbursement from those whose duty it discharges." (3 Cal.3d at p. 968.)

Applying this analysis to the facts before it, the *Boss* court concluded that because of the substantial assets possessed by the parent recipient, including a $30,000 home, Civil Code section 206 placed no legal obligation of support upon her adult child and consequently such child could not be required to reimburse the state for old age benefits granted to the parent. Under these circumstances, the court in *Boss* found it unnecessary to pass on the validity of the relative responsibility provisions as applied to an adult child who did fall within section 206's terms.

In ostensibly undertaking to answer the question left open by *Boss,* however, the majority have gone much further and have completely overruled the matters that were definitively resolved by the *Boss* opinion. Thus, the majority do not simply hold that those adult children who are legally obligated to support their parents under the newly amended section 206 may be required to reimburse the state, but instead the majority have declared that since children as a whole have benefited from parents, the state may require adult children to pay the costs of old age benefits provided to their parents regardless of whether the particular individual child is under a legal obligation under section 206 to support his parents.[2] By such a ruling,

---

[2]In holding that the rationality of requiring reimbursement from a particular adult child should not be determined by whether that particular child had an *individual* duty to support his parent under section 206, the majority purport to rely on this court's pre-*Kirchner* decision of *County of San Bernardino* v. *Simmons* (1956) 46 Cal.2d 394, 296 P.2d 329. The majority's treatment of *Simmons,* however, is defective in several respects.

First, the majority inaccurately state that *Simmons* was an action brought by the county pursuant to former section 2224 of the Welfare and Institutions Code. Actu-

under which the circumstances of the individual case become irrelevant,[3] the majority have undeniably overruled the principal holding of *Boss,* for under the majority's proposed test the adult child in *Boss*—one of the class of persons generally benefited by parents—would have been liable to the state.

ally, the county had initially sought recovery from the relative on two grounds: (1) under section 2224 and (2) on a subrogation theory based upon the relative's duty under Civil Code section 206. The decision explains that the county's "first cause of action is, as stated in section 2224 of the Welfare and Institutions Code, 'to recover for said county such portion of the aid granted as said relative is able to pay, and to secure an order requiring the payment of any sums which may become due in the future for which the relative may be liable.' " (46 Cal.2d at p. 395.) The trial court specifically struck this initial claim under section 2224, and the county did not appeal from that ruling. (*Id.* at p. 396.) Thus the *Simmons* opinion in this court dealt solely with the question of whether a county could proceed directly under section 206, and did not pass on the specific relative responsibility provision at all.

Second, in determining that the county could not proceed directly under section 206, the *Simmons* court merely found that the Legislature had not intended to permit the county to proceed under this provision. The decision was thus simply concerned with a matter of statutory interpretation and did not address the question of the relationship between section 2224 and section 206 as a constitutional matter.

That constitutional issue was addressed by the Court of Appeal in *In re Dudley* (1966) 239 Cal.App.2d 401, 410 [48 Cal.Rptr. 790], where the court held that the alleged arbitrariness of a given relative responsibility law had to be determined by whether the charged relative was "otherwise liable" to provide such support. In *Dudley,* the court found the required reimbursement permissible because on the facts before it the charged relative was responsible under section 206 for his adult child's support. *Dudley* obviously proceeded on the theory, however, that the question of arbitrariness had to be judged on the basis of whether the *particular* relative had an *individual* duty to the beneficiary of the state service for it expressly distinguished *Kirchner* as a decision in which the *particular* relative (an adult child) did not have such a duty. (239 Cal.App.2d at p. 412.)

In the course of its analysis, the *Dudley* court explained that nothing in the *Simmons* opinion negated the relevance of section 206 in determining the arbitrariness or reasonableness of a given relative responsibility law. (239 Cal.App.2d at p. 410.) The majority's present use of the *Simmons* opinion thus is directly contrary to the analysis, and holding, of *Dudley.*

[3]The significance of this holding is that the considerable case law interpreting the scope of section 206's duty becomes irrelevant in determining whether a child is obligated to pay the state for old age benefits granted to his parents. The cases interpreting section 206 establish that in determining the extent of an adult child's obligation under that provision a great many factors must be considered, including (1) the demands of the adult child's children (which take precedence over the parent's needs (see *People* v. *Curry* (1924) 69 Cal.App. 501, 507 [231 P. 358])), (2) the total wealth of all the parent's children (see *Britton* v. *Steinberg* (1962) 208 Cal.App.2d 358 [24 Cal.Rptr. 831]), and (3) whether the parent, by ill treatment of the child, has lost his right to demand full support from his child. (See *Radich* v. *Kruly* (1964) 226 Cal.App.2d 683, 687 [38 Cal.Rptr. 340].) (See generally *Gluckman* v. *Gaines* (1968) 266 Cal.App.2d 52, 54-55 [71 Cal.Rptr. 795].) Under the majority's approach, however, this variety of factors need never be considered in judging the validity of a state's demand that a particular child pay for state services provided to his parent.

2. *The change in constitutional standards proposed by the majority removes significant constraints on the abuse of majoritarian power and opens the door to a wide range of measures placing disproportionate financial burdens on disparate minorities.*

The above review of the cases demonstrates that the proposed majority decision works a radical change in the constitutional standard that has been applied in evaluating similar "relative responsibility" enactments in this state in recent years. The proposed change in my view represents a dangerous abandonment of limitations on majoritarian power which adhered in the *Kirchner* line of decisions.

As *Kirchner* itself demonstrates, the cautious attitude of California courts toward relative responsibility provisions reflects a basic concern that the state may be unfairly shifting the burden of public expenses onto a small segment of the citizenry; past decisions have implicitly recognized that the potential abuse of majoritarian power is particularly hazardous in this context, because the group singled out to bear a disproportionate share of the public expense will frequently be a small minority, often with no cohesive characteristics that would permit effective political representation. Thus, for example, the class of adult children of recipients of old age benefits is not likely to be an organized force capable of resisting the always popular efforts to reduce the general tax burden.

*Kirchner* and its progeny responded to this potential danger of governmental overreaching by recognizing that the state constitutional equal protection clauses limit the government's power to charge one class of citizens for public benefits bestowed on other citizens. These decisions established that in California, the constitutional guarantees permit the state to obtain reimbursement of public expenditures from a designated class of persons only when the individuals being charged would have been responsible for the expenses absent any state decision to establish a public program. If the individuals did not have such a "preexisting" or "independent" legal duty, past cases had established that it is arbitrary and unconstitutional for the state to single out such individuals to pay a disproportionate share of the costs of a public program.

The majority opinion, perhaps unwittingly, removes the constraints established by the prior decisions, and suggests that the state may charge one class of citizens for benefits the state chooses to bestow on others whenever there is simply a rational relationship between the benefited group and the citizens to be charged.[4] It matters not, say the majority,

---

[4]At one point the majority suggest that the ultimate constitutional question "is whether placing the burden for [poor parents'] support upon the adult children bears

that the individual who must pay the bill was not otherwise obligated to provide the service before the state decided to provide it, so long as it is "rational" to charge him for it. The potential consequences of such a holding are ominous.

Under the majority's newly propounded "rationality" test, a government intent on reducing the general tax burden could single out insulated minority classes to bear a disproportionate share of the tax burden of a whole range of public services. Thus, for example, the "mere rationality" standard would permit the state not only to charge adult children with the costs of old age benefits but would authorize public savings by charging such children for the costs of subsidized housing projects, medical care, recreational centers, reduced public transportation fares and the various other social programs the state decides to make available to its senior citizens. Although the children of the recipients of such benefits may have had no preexisting obligation to pay for such services, the majority's constitutional test would presumably sanction such charges on the ground that children as a whole have benefited from parents. Moreover, since the circumstances of the individual case are assertedly irrelevant, the state presumably could require even a child who had been abandoned by his parents to pay the costs of these varied public programs.[5]

A further example may provide an even sharper illustration of the potential dangers loosed by the majority's constitutional approach. Assume the state decided to initiate bilingual educational programs to improve the educational opportunities offered to children from non-English-speaking households. Could the state, to reduce public costs, require the parents of such children to finance this entire public program? To be parallel to the present case, of course, we must assume that the charged parents could not decline to have their children take part in the program so long

some rational relationship to the accomplishment of the state purpose of relieving the public treasury." (*Ante* at p. 506.) The relevant question cannot be, however, simply whether charging adult children is rationally related to cutting public expenses, for charging *any class* of citizens (e.g., red-headed men) for such expenses would be rationally related to that purpose. (See Comment (1964) 39 N.Y.U.L.Rev. 858, 864.) Instead, I assume that the basis for the majority decision is that there exists a rational relationship between the class of adult children and the beneficiaries of old age security benefits for whose support they are being charged. My analysis proceeds on this assumption.

[5]Although the majority note (*ante,* p. 506, fn. 15) that some (but not all) abandoned children are at present exempted from the liability imposed by sections 12100 and 12101 of the Welfare and Institutions Code, under the majority approach there is no constitutional requirement that such children be relieved of this liability, as they are under section 206. (See *Radich* v. *Kruly* (1964) 226 Cal.App.2d 683, 687 [38 Cal.Rptr. 340].)

as the children chose to do so. The proposed "rationality" test of the majority apparently would permit this type of cost savings, foisting public expenditures onto the shoulders of those related to the beneficiaries of the public program.

Moreover, nothing in the mere "rationality" test proposed by the majority would limit the state's power to obtain reimbursement to *relatives* of recipients of public benefits. Many diverse groups of people receive "benefits" from persons who in turn are beneficiaries of government programs. Under the majority approach, for example, homeowners whose houses are saved from destruction by local firemen could presumably be required to finance the fire department's retirement benefit program; citizens who seek the assistance of police could be made responsible for widow's benefits paid in the event of a policeman's death. The examples of disproportionate taxation schemes sanctioned by the majority's proposed constitutional standard are endless; the defect in the suggested test is that it abandons the constitutional limits established in the California decisions to date.

3. *Under established constitutional principles, sections 12100 and 12101 are invalid both because the duty of support imposed upon adult children by section 206 is not "independent" of the state's reimbursement scheme and because the sections invidiously discriminate against poor families.*

The validity of sections 12100 and 12101, I submit, must be judged by the constitutional criteria developed in our prior cases. Under these precedents, the relevant question in the instant case is whether adult children bear a "preexisting" or "independent" duty to support their needy parents which the state discharges by its grant of old age benefits, or, in other words, whether such adult children would be obligated to support their parents even if the state had not decided to provide such aid. When this question is faced directly, I believe it becomes clear that no such "independent" duty is present.

Defendants, of course, rely upon Civil Code section 206 as providing the "independent" duty of adult children to support their needy parents which purportedly rationalizes the relative responsibility provisions at issue here. In one sense, section 206 as amended does provide a duty "independent" of sections 12100 and 12101, for under its terms an adult child may be responsible for supporting his poor parent whether or not the state actually provides the parent with old age benefits. But such a narrow interpretation of the "independent legal duty" requirement loses sight of the fundamental purpose served by this requirement.

As discussed above, the cases have insisted that a class of citizens be under an "independent duty" to provide support before the state can impose a reimbursement requirement in order to prevent a majority from arbitrarily charging a small segment of the population for public programs which the majority desires to implement. This purpose is completely defeated if the state can create an "independent" legal duty simply to implement its reimbursement program; under such circumstances, the "independent" duty serves no check on majoritarian abuse. Defendants do not contest that the newly amended provisions of section 206 were enacted as an integral part of the challenged relative responsibility scheme. Under these circumstances, the new portion of section 206, placing a duty on adult children to support parents "in need," can in no sense be said to establish an "independent" legal duty as that term has been used in our prior cases.

Moreover, even the long-established provisions of section 206 which preceded the 1971 amendments cannot properly be said to establish an "independent duty" of adult children to support their poor parents. As the majority recognize, the duty to support embodied by section 206 did not exist at common law but was first established as part of the Elizabethan Poor Law. As this court has pointed out on numerous occasions in the past, and as the majority concede, from its very inception this provision " 'was designed to indemnify the public and to minimize its costs in relieving the poor.' . . . 'It has been stated that the "main purpose of the statute seems to be to protect the public from the burden of supporting people who have children able to support them." ' " (*Ante,* at pp. 502-503.)[6]

This historical background demonstrates that the statutory duty of support created by section 206 has never been "independent" of the state's reimbursement provisions but, on the contrary, was established simply to implement such reimbursement and to reduce the state's responsibilities. Thus, unlike the common law duties of support that exist between husband and wife and parent and child, section 206's duty serves no general public role other than "to relieve the public treasury of part of the burden cast upon it by the public assumption of responsibility to maintain the destitute." (*County of San Mateo* v. *Boss* (1971) 3 Cal.3d 962, 971, fn. 8 [92 Cal.Rptr. 294, 479 P.2d 654].) Given the history and purpose of section 206, it cannot be said that adult children would have been legally obligated to support their needy parents *absent the state's decision to provide such*

---

[6]See Friedman, A History of American Law (1973) pages 181, 590-591. For an explanation of the impact of the Elizabethan laws upon the development of American poor relief and a critique of the continued reliance upon these procedures in contemporary America, see Sister Alice Tobriner, A Sixteenth-Century Urban Report (1971) pp. 27-28.

*aid.* Accordingly, section 206 does not establish a preexisting, independent duty of support constitutionally sufficient to justify the challenged relative responsibility provisions.[7]

Furthermore, even if section 206 could be said to create an "independent" duty on adult children under our prior decisions, I still believe the challenged provisions are invalid as an invidious discrimination against the children of poor parents.

As noted earlier, the majority uphold the rationality of the provisions at issue by observing that since children as a class have benefited from the support of their parents, it is reasonable to require children to support their parents. The fallacy with this reasoning as applied to the instant case, however, is that the state has not chosen to charge *all* children with the cost of supporting parents but instead it has singled out children of poor or needy parents to bear this burden. The fact that such children of poor parents in general have benefited from the support of their parents does not distinguish this class from the large class of "adult children" who are not required to assume the contested financial burden; these other adult children, whose parents either have sufficient resources of their own or have already died, presumably also benefited from parental support during their youth but they are not required to make financial contributions under the challenged provisions. Instead, it is only the adult children whose parents continue to live and happen to be poor who are compelled to shoulder the financial burden. In my view, the singling out of this group for such a burden denies them the equal protection of the laws.

The majority's response to this contention is apparently that the state is not required to grant aid to parents with sufficient financial resources and since it has chosen to give aid only to poor parents it is proper to seek reimbursement only from the children of such poor parents. No one, of course, contends that the state should give aid to financially secure persons. But the permissibility of limiting aid to the needy aged does not answer

---

[7] *In re Dudley* (1966) 239 Cal.App.2d 401 [48 Cal.Rptr. 790] appears to be the only California decision to find that the legal duty imposed by section 206 constitutes a sufficient "independent duty" to justify a reimbursement requirement imposed upon a responsible relative, in that case upon a parent for the expenses of caring for an adult child. The *Dudley* court reached this conclusion, however, without analyzing the basic purpose of the "independent duty" requirement and without recognizing that the history of section 206 demonstrates that this duty was imposed on relatives simply for the purpose of reducing the state's financial obligations. A more recent Court of Appeal decision, *Department of Mental Hygiene v. Bank of America* (1970) 3 Cal. App.3d 949, 954 [83 Cal.Rptr. 559], held that section 206 was not a sufficient basis to justify charging a parent for the public costs incurred on behalf of his mentally ill child.

the question of how the adult children of such persons can rationally be distinguished from other adult children who are similarly situated with respect to prior parental benefits. The fact of the matter is that the challenged provisions attach serious financial consequences to the frequently fortuitous circumstance of whether one's parents are alive and in need.

Moreover, the classification scheme created by the relative responsibility provision is doubly invidious because, as a practical matter, in the great majority of cases the adult children of "parents in need" themselves command only very modest incomes. Technically, of course, it is true that, as the majority point out, the challenged provisions apply to *all* children of poor parents, whether the children be rich or poor. We blind ourselves to reality, however, if we do not recognize that by and large poor parents have less-then-wealthy adult children, adult children who, more often than not, are beginning to raise their own families and attempting to improve their economic condition. It is this class of citizens that the challenged provisions single out to bear an additional burden, a burden which is imposed not because of any personal failing of the adult child, but simply because his parent happens to be poor. Thus, in addition to all the disadvantages poverty may earlier have cast on this class of citizens, these adult children are required once again to bear an increased burden simply because their family is poor.

The disproportionate burden which relative responsibility laws place on the poor is not a contemporary phenomenon. As Professor tenBroek extensively demonstrates in his exhaustive study of the development of California family law, from the time of the Elizabethan Poor Laws the Anglo-Saxon legal system has incorporated a dual system of family law, one applicable to the poor and the other to the rest of society. "The . . . basis of the overall classification—the family law of the poor—and the source of its distinction from the family law of the rest of the community, is that the families who are its subjects are poor. *It is this basic fact, the poverty of the class of persons entitled to assistance under the state's welfare laws, which underlies the further and altogether dependent classification of certain relatives of such persons as responsible.* One classification based on poverty is thus built upon another, and the whole system is accordingly doubly invidious." (Italics added.) (tenBroek, *California's Dual System of Family Law: Its Origin, Development and Present State, Part III* (1965) 17 Stan.L.Rev. 614, 644.)

Professor tenBroek continues the above paragraph, written in 1965, with a question: "In this age of a renewed quest for equality and a national rediscovery of the human and moral elements in the Constitution, should

not poverty as a classifying trait be declared inherently discriminatory and outlawed because of its very nature, and 'the mere fact of being without funds' be held 'constitutionally an irrelevance like race, creed or color' as Mr. Justice Jackson said and as *Griffin* and *Gideon* imply?" (Fns. omitted.) (*Id.*) One would have thought that given this court's recent decisions in *In re Antazo* (1970) 3 Cal.3d 100, 112 [89 Cal.Rptr. 255, 473 P.2d 999], and *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241], the answer to this query would have been a resounding affirmation. Instead, the majority approve the perpetuation of a dual system of family law which places special disabilities on families of the poor.

### 4. *Conclusion.*

As discussed at length above, the majority opinion effectively overrules this court's prior unanimous decisions in *Kirchner, In re Ricky H.*, and *Boss* as well as a score of Court of Appeal decisions implementing the *Kirchner* decision. In discarding the approach of *Kirchner*, characterized by the leading scholar in the field as a "landmark" decision (see tenBroek, *supra,* 17 Stan.L.Rev. 614, 638), the majority remove major constraints on the authority of government to impose public expenses on a small class of citizens and open wide the door to future "tax saving" schemes which place disproportionate shares of public expenses on various minority groups. Moreover, in upholding the specific relative responsibility provisions at issue here, the majority sanction a perpetration of a dual system of family law which places special financial burdens on individuals simply because of the poverty of their families. I cannot join in such a holding.

It might be possible to understand the reasons for the majority's uprooting of a consistent line of precedent and creation of a novel constitutional ruling if the legislation challenged in the instant case offered the promise of unquestionably beneficial social consequences; under such circumstances one might expect to find the court questioning past decisions that impeded the salutary result. The statutes in question here, however, offer no such beneficient social consequences.

On the contrary, almost all observers agree that the social effects of the challenged relative responsibility provisions are harsh and self-defeating. "[A] large body of social work opinion [has long maintained] that liability of relatives creates and increases family dissension and controversy, weakens and destroys family ties at the very time and in the very circumstances when they are most needed, imposes an undue burden upon the poor . . . and is therefore socially undesirable, financially unproductive, and admin-

istratively infeasible." (tenBroek, *supra,* 17 Stan.L.Rev. at pp. 645-646.) As Justice Friedman, writing for the Court of Appeal in the instant case, observed: "[The challenged provisions] strike most aggressively and harshly at adult children occupying the lower end of the income scale. The enforced shift of subsistence funds from one generation to the other distributes economic desolation between the generations. It galls family relationships. It injects guilt and shame into elderly citizens who have made their contributions to society and have become dependent through life's vicissitudes."

Jenny Baxter, a 75-year-old Californian receiving Old Age Security benefits, eloquently summarized the true effect of the relative responsibility laws: "No one is born into this world with a debt to their parents for their birth and contributions until their maturity. That is the parents' contribution to life and society. When the child reaches maturity, he starts a new separate unit and in turn makes his contribution to life and society as did his parents, carrying on the generation cycle on through eternity. The children should not be saddled with unjust demands that keep them at or near poverty level with no hope to escape it, just because a parent still breathes. And aged parents should not have to live their remaining lives facing the heartbreaking experience of being such a burden to their children. Many would prefer death but are afraid of retribution for taking their own lives. Their grief—a living death."

The majority have uprooted cases deep in the subsoil of our law. The tragedy lies in the fact that those cases were the product of the courts' sensitive accommodation of constitutional principle to social reality. Thus the majority have turned back the pages of judicial history and restored the inequitable requirement that some of the poor support others of the poor; the majority defend again the arbitrary selection of a private group to bear a public burden; the majority disregard the constitutional injunction against the denial of the equal protection of the laws.

I would affirm the superior court judgment invalidating the challenged provisions as a denial of equal protection of the laws.

Mosk, J., concurred.